# EXHIBIT A

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

NETWORK SYSTEM TECHNOLOGIES, INC. )
d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, )
an Illinois corporation, )
               Plaintiff, )     Case No. 07 L 988
                       )
vs. )
                       )
SIGMA CHI FOUNDATION, a Colorado )
not-for-profit corporation; and SIGMA CHI )
CORPORATION, an Illinois not-for-profit )
corporation; )
              Defendants. )

## AMENDED COMPLAINT AT LAW

NOW COMES the Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC.

d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, by its attorneys,

and for its Amended Complaint at Law against Defendants, SIGMA CHI

FOUNDATION, a Colorado not-for-profit corporation, and SIGMA CHI

CORPORATION, an Illinois not-for-profit corporation, states as follows:

### Parties

1.    Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. is an Illinois

corporation doing business under the assumed name, INCENTRA SOLUTIONS OF

ILLINOIS ("NST"), with its principal place of business located at 2050-80 Finley Road,

Village of Lombard, County of DuPage, and State of Illinois.

2.    Upon information and belief, Defendant, SIGMA CHI FOUNDATION, is a

Colorado not-for-profit corporation, with its principal place of business located at 1714

Hinman Avenue, Village of Evanston, County of Cook, and State of Illinois.

1

3.     Upon information and belief, Defendant, SIGMA CHI CORPORATION, is an

Illinois not-for-profit corporation, with its principal place of business located at 1714

Hinman Avenue, Village of Evanston, County of Cook, and State of Illinois.

### Jurisdiction and Venue

4.     Jurisdiction and venue rest with this Court because Plaintiff resides in DuPage

County, Illinois; Defendants do business in DuPage County, Illinois; and, the events

giving rise to the claims herein took place, at least in part, in DuPage County, Illinois.

### COUNT I
### (Sigma Chi Foundation's Breach of Gridworks Master Services Agreement)

5.     Prior to May 31, 2006, NST, through its agent, Robert Wosneski, and Sigma Chi

Foundation, through its agent, Daniel Walker, entered into contract negotiations

regarding an agreement by which NST would provide managed, computer backup and

storage services for the benefit of Sigma Chi Corporation.

6.     Sigma Chi Corporation and Sigma Chi Foundation share the same office located

at 1714 Hinman Avenue, in Evanston, Illinois. At all times relevant to this Complaint,

Sigma Chi Foundation and Sigma Chi Corporation shared the same computer server and

computer environment, with full access to each other's computer information.

7.     On or about May 31, 2006, NST and Sigma Chi Foundation entered into a written

contract entitled Gridworks Master Services Agreement ("GMS Agreement"), whereby

NST agreed to provide Sigma Chi Corporation with, among other things, a storage

monitor, alert, and notification service run by a network storage operations center located

in Colorado. In exchange for the services rendered to Sigma Chi Corporation, Sigma Chi

Foundation agreed to pay NST certain recurring and non-recurring monthly fees pursuant

to the terms of the GMS Agreement.

8.    Both Defendants benefited from the services rendered by NST under the GMS Agreement, and both Defendants are parties to the GMS Agreement. See copy of GMS Agreement, as amended, attached hereto and made a part hereof as Exhibit "A."

9.    The Initial Term of the GMS Agreement began July 1, 2006, and runs through July 1, 2009. The payment terms are outlined in Schedule A-3 of the GMS Agreement (Exhibit "A" to this Amended Complaint) and the attached Amendments thereto.

10.    The GMS Agreement was negotiated by Sigma Chi Foundation's Director of Intellectual Technology, Daniel Walker, who signed and dated the GMS Agreement, and all amendments thereto, on behalf of Sigma Chi Corporation and Sigma Chi Foundation on or about June 8, 2006.

11.    From on or about July 1, 2006, through on or about October 31, 2006, Sigma Chi Foundation made monthly recurring payments of approximately $3,895.00 to NST, as well as certain non-recurring monthly payments, all under the express terms of the GMS Agreement.

12.    From on or about November 1, 2006, through the present, Sigma Chi Foundation has failed and refused to make either the recurring or the non-recurring monthly payments to NST that are required by the GMS Agreement.

13.    On or about February 2007, at the request of Defendants, NST performed additional professional services for Defendants under the GMS Agreement. Specifically, NST provided 41.75 hours of supplemental support services at the rate of $150/hour, pursuant to the On-Demand Service Pricing found at page 9 of 19 under Schedule A-3 of the GMS Agreement. NST issue invoice no. INV-000501 to Defendants in the amount of

3

$6,262.50 for said services. See copy of Invoice attached hereto and made a part hereof as Exhibit "B."

14. NST has satisfied all of its obligations under the GMS Agreement.

15. NST has made demand of Sigma Chi Foundation to make the foregoing outstanding payments to NST, which are due under the GMS Agreement.

16. Sigma Chi Foundation has failed and refused to make said payments, even after demand was made. Sigma Chi Foundation's failure and refusal to make the outstanding payments constitutes a material breach of the GMS Agreement.

17. Sigma Chi Foundation's refusal to make the outstanding payments is unreasonable and vexatious. NST is entitled to prejudgment interest on the outstanding payments at the rate of 5% per annum pursuant to 815 ILCS 205/2 as a result of Defendant's unreasonable and vexatious delay of payment.

18. Pursuant to the GMS Agreement, which is subject to the laws of the State of Colorado, NST is entitled to recover its reasonable attorney's fees from Sigma Chi Foundation.

19. Further, NST is entitled to interest on the outstanding payments in the amount of 18% per annum.

20. As a result of Sigma Chi Foundation's breach of the GMS Agreement, NST has been damaged in the amount of, at least, $30,003.50, plus future lost profits through July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus reasonable attorney's fees.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this

4

Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI FOUNDATION, a Colorado not-for-profit corporation, in excess of $30,003.50, plus future lost profits through, at least, July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus reasonable attorney's fees, all costs of suit, and such further relief as this Court deems appropriate and just.

### COUNT II
### (Sigma Chi Corporation's Breach of Gridworks Master Services Agreement)

21.    NST restates and realleges paragraphs 1 through 20 above as and for its paragraph 21 of Count II as though fully stated herein.

22.    Sigma Chi Corporation benefited directly from the GMS Agreement in that it received the services that NST provided under the GMS Agreement. Further, Sigma Chi Corporation directed NST to issue its invoices to Sigma Chi Foundation.

23.    By entering into the GMS Agreement on behalf of "Sigma Chi" and allowing Sigma Chi Foundation to pay the monthly recurring payments of approximately $3,895.00 to NST, as well as certain non-recurring monthly payments, all under the express terms of the GMS Agreement, Sigma Chi Corporation demonstrated its intent to hold itself out as one and the same entity as Sigma Chi Foundation for purposes of the GMS Agreement.

24.    As a result, Sigma Chi Corporation is an actual party to the GMS Agreement and is liable for all amounts due to NST pursuant to the GMS Agreement.

25.    From on or about July 1, 2006, through on or about October 31, 2006, Sigma Chi Corporation allowed Sigma Chi Foundation to make monthly recurring payments of approximately $3,895.00 to NST, as well as certain non-recurring monthly payments, all

5

under the express terms of the GMS Agreement, and all for Sigma Chi Corporation's benefit.

26.     From on or about November 1, 2006, through the present, Sigma Chi Corporation has failed and refused to make either the recurring or the non-recurring monthly payments to NST that are required by the GMS Agreement.

27.     On or about February 2007, at the request of Defendants, NST performed additional professional services for Defendants under the GMS Agreement. Specifically, NST provided 41.75 hours of supplemental support services at the rate of $150/hour, pursuant to the On-Demand Service Pricing found at page 9 of 19 under Schedule A-3 of the GMS Agreement. NST issue invoice no. INV-000501 to Defendants in the amount of $6,262.50 for said services. See copy of Invoice attached as Exhibit "B."

28.     NST has satisfied all of its obligations under the GMS Agreement.

29.     NST has made demand of Sigma Chi Corporation to make the outstanding monthly payments to NST due under the GMS Agreement.

30.     Sigma Chi Corporation has failed and refused to make said payments, even after demand was made. Sigma Chi Corporation's failure and refusal to make the outstanding payments constitutes a material breach of the GMS Agreement.

31.     Sigma Chi Corporation's refusal to make the outstanding payments is unreasonable and vexatious. NST is entitled to prejudgment interest on the outstanding payments at the rate of 5% per annum pursuant to 815 ILCS 205/2 as a result of Defendant's unreasonable and vexatious delay of payment.

32.    Pursuant to the GMS Agreement, which is subject to the laws of the State of Colorado, NST is entitled to recover its reasonable attorney's fees from Sigma Chi Corporation.

33.    Further, NST is entitled to interest on the outstanding payments in the amount of 18% per annum.

34.    As a result of Sigma Chi Corporation's breach of the GMS Agreement, NST has been damaged in the amount of, at least, $30,003.50, plus future lost profits through July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus reasonable attorney's fees.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI CORPORATION, an Illinois not-for-profit corporation, in an amount in excess of $30,003.50, plus future lost profits through, at least, July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus reasonable attorney's fees, all costs of suit, and such further relief as this Court deems appropriate and just.

### Count III
### (Unjust Enrichment Against Sigma Chi Corporation – In the Alternative)

In the alternative, and without prejudice to its claims for breach of contract, Plaintiff alleges the following claim for Unjust Enrichment against Defendant, Sigma Chi Corporation.

35.    NST restates and realleges paragraphs 1 through 20 above as and for its paragraph 35 of Count III as though fully set forth herein.

36.     Sigma Chi Foundation and Sigma Chi Corporation induced NST to enter into the GMS Agreement and provide the services contemplated thereunder to Sigma Chi Corporation by promising to pay NST for those services.

37.     NST reasonably relied on Sigma Chi Foundation's promises to pay the amounts due under the GMS Agreement because NST had entered into other, similar agreements with Sigma Chi Foundation for the benefit of Sigma Chi Corporation for which Sigma Chi Foundation had and was making payments.

38.     In reliance on Defendants' promises of payment, NST entered into the GMS Agreement with Sigma Chi Foundation for the benefit of Sigma Chi Corporation.

39.     NST furnished valuable services to Sigma Chi Corporation under the terms of the GMS Agreement.

40.     Sigma Chi Corporation received the valuable services furnished by NST under the terms of the GMS Agreement.

41.     Under the foregoing circumstances, it would be unjust for Sigma Chi Corporation to retain the benefit of the services provided by NST without paying for said services.

42.     The value of the benefit received and retained by Sigma Chi Corporation from NST equals $30,003.50, plus future lost profits through, at least, July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus the reasonable attorney's fees incurred by NST in pursuing its claims against Sigma Chi Corporation.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI

CORPORATION, an Illinois not-for profit corporation, in the amount of, at least, $30,003.50, plus future lost profits through, at least, July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus reasonable attorney's fees, all costs of suit, and such further relief as this Court deems appropriate and just.

### Count IV
### (Quantum Meruit Against Sigma Chi Corporation – In the Alternative)

In the alternative, and without prejudice to its claims for breach of contract, Plaintiff alleges the following claim for Quantum Meruit against Defendant, Sigma Chi Corporation.

43.    NST restates and realleges paragraphs 1 through 20 above as and for its paragraph 43 of Count IV as though fully set forth herein.

44.    Sigma Chi Foundation and Sigma Chi Corporation induced NST to enter into the GMS Agreement and provide the services contemplated thereunder to Sigma Chi Corporation by promising to pay NST for those services.

45.    NST reasonably relied on Sigma Chi Foundation's promises to pay the amounts due under the GMS Agreement because NST had entered into other, similar agreements with Sigma Chi Foundation for the benefit of Sigma Chi Corporation for which Sigma Chi Foundation had and was making payments.

46.    In reliance on Defendants' promises of payment, NST entered into the GMS Agreement with Sigma Chi Foundation for the benefit of Sigma Chi Corporation.

47.    NST furnished valuable services to Sigma Chi Corporation under the terms of the GMS Agreement.

48.    Sigma Chi Corporation received the valuable services furnished by NST under the terms of the GMS Agreement.

49.    Under the foregoing circumstances, it would be unjust for Sigma Chi Corporation to retain the benefit of the services provided by NST without paying for said services.

50.    The reasonable value of the services furnished by NST and retained by Sigma Chi Corporation from NST equals $30,003.50, plus future lost profits through, at least, July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus the reasonable attorney's fees incurred by NST in pursuing its claims against Sigma Chi Corporation.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI CORPORATION, an Illinois not-for profit corporation, in the amount of, at least, $30,003.50, plus future lost profits through, at least, July 1, 2009, plus contractual interest as it accrues, plus statutory prejudgment interest as it accrues, plus reasonable attorney's fees, all costs of suit, and such further relief as this Court deems appropriate and just

### Count V
### (Sigma Chi Foundation's Breach of Service Agreements)

51.    NST restates and realleges paragraphs 1 through 4 above as and for its paragraph 51 of Count V as though fully stated herein.

52.    In or about 2006, through early 2007, NST provided certain labor and materials to Sigma Chi Corporation at the specific requests of Sigma Chi Foundation through their Director of Intellectual Technology, Daniel Walker, and others. The requests were made and accepted through Purchase Orders that were signed by Daniel Walker on behalf of Sigma Chi Foundation and Sigma Chi Corporation. The Purchase Orders constitute

Service Agreements between NST and both Sigma Chi Foundation and Sigma Chi Corporation.

53.     Specifically, on or about December 15, 2006, Daniel Walker, as agent for Sigma Chi Corporation and Sigma Chi Foundation, signed Proposal No. INCQ6548, dated 12/14/06, and a corresponding Work Order.   See copy of Signed Proposal and corresponding Work Order attached hereto and made a part hereof as Exhibit "C-1".

54.     Pursuant to the Proposal and Work Order attached as Exhibit "C-1", NST provided professional services to Defendants involving a Red Hat Server conversion and the porting over of two SQL databases for an agreed upon price of $18,185.00, which services were provided to Sigma Chi Corporation at the request of Sigma Chi Foundation in or about December of 2006. NST has satisfied all of its obligations under the attached Service Agreement.

55.     At the direction of Defendants, NST issued Invoice No. INV-000205 to Sigma Chi Foundation, dated 12/29/2006, in the amount of $18,185.00.   See copy of Invoice attached hereto and made a part hereof as Exhibit "C-2."

56.     Defendants failed and refused to pay for the services rendered by NST. Defendants' mutual failure and refusal to pay constitutes a breach of the Service Agreement, which is Proposal No. INCQ6548.  NST has been damaged in the amount of $18,185.00, plus interest as a result of Defendants' breach.

57.     In addition, on or about January 15, 2006, Daniel Walker, as agent for Sigma Chi Corporation and Sigma Chi Foundation, signed Proposal No. INCQ6475, dated 12/13/06, requesting professional services from NST for the Webshpere project, for an estimated

price of $47,200.00. See copy of Signed Proposal attached hereto and made a part hereof as Exhibit "D-1".

58.     Pursuant to the Proposal attached as Exhibit "D-1", NST provided a total of 1423 hours of professional services to Defendants relating to the Websphere project throughout 2006. NST has satisfied all of its obligations under the attached Service Agreement.

59.     At Defendants' request, NST issued Invoice No. INV-000476, dated 02/24/2007, in the amount of $59,200.00, to Sigma Chi Foundation. See copy of Invoice attached hereto and made a part hereof as Exhibit "D-2."

60.     Defendants failed and refused to pay for the services rendered by NST. Defendant's failure and refusal to pay constitutes a breach of the Service Agreement, which is Proposal No. INCQ6475. NST has been damaged in the amount of $59,200.00, plus interest as a result of Defendants' breach.

61.     In addition, on or about October 11, 2006, Daniel Walker, as agent for Sigma Chi Corporation and Sigma Chi Foundation, signed Proposal No. NSTQ5503, dated October 11, 2006, requesting a computer equipment enclosure, for an agreed upon price of $989.00, plus freight and sales tax. See copy of Signed Proposal attached hereto and made a part hereof as Exhibit "E-1".

62.     Pursuant to the Proposal attached as Exhibit "E-1", NST supplied Defendants with Netshelter VX 25U enclosure with black sides, which was shipped to Sigma Chi Corporation on or about December 15, 2006. NST has satisfied all of its obligations under the attached Service Agreement.

63.     At Defendants' direction, NST issued Invoice No. INV-000240, dated 12/15/2006, to Sigma Chi Foundation for the computer equipment enclosure, in the

amount of $1071.43. See copy of Invoice attached hereto and made a part hereof as Exhibit "E-2."

64.    Defendants failed and refused to pay for the services rendered by NST. Defendants' failure and refusal to pay constitutes a breach of the Service Agreement, which is Proposal No. NSTQ5503. NST has been damaged in the amount of $1071.43, plus interest as a result of Defendants' breach.

65.    NST has made demand of Sigma Chi Foundation to make the total outstanding payments due of $78,456.43 to NST for the labor and materials provided pursuant to all three of the above-referenced Service Agreements.

66.    Sigma Chi Foundation's refusal to make the outstanding payments is unreasonable and vexatious. NST is entitled to prejudgment interest on the outstanding payments at the rate of 5% per annum pursuant to 815 ILCS 205/2 as a result of Sigma Chi Foundation's unreasonable and vexatious delay of payment.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI FOUNDATION, a Colorado not-for-profit corporation, in the amount of $78,456.43, plus statutory prejudgment interest as it accrues, all costs of suit, and such further relief as this Court deems appropriate and just.

### Count VI
### (Sigma Chi Corporation's Breach of Service Agreements)

67.    NST restates and realleges paragraphs 51 through 66 of Count V as and for its paragraph 67 of Count VI as though fully stated herein.

68.    Sigma Chi Corporation benefited directly from the Service Agreements attached as Exhibits C-1, D-1, and E-1 in that it received the services and materials that NST provided under the Service Agreements.

69.    Sigma Chi Corporation demonstrated its intent to hold itself out as one and the same entity as Sigma Chi Foundation for purposes of the Service Agreements by allowing Sigma Chi Foundation to enter into the Service Agreements on behalf of "Sigma Chi" and instructing NST to bill Sigma Chi Foundation, while Sigma Chi Corporation received the benefits of the Service Agreements.

70.    As a result, Sigma Chi Corporation is an actual party to the Service Agreements and is liable for all amounts due to NST pursuant to the Service Agreements.

71.    As set forth more fully in paragraph 62 above, in or about 2006, through early 2007, NST provided certain labor and materials to Sigma Chi Corporation at the specific written requests of Sigma Chi Foundation through their Director of Intellectual Technology, Daniel Walker. The requests were made and accepted through Purchase Orders that were signed by Daniel Walker on behalf of Sigma Chi Foundation and Sigma Chi Corporation. The Purchase Orders constitute Service Agreements between NST and both Sigma Chi Foundation and Sigma Chi Corporation. See copies of Purchase Orders attached hereto and made a part hereof as Exhibits "C-1, D-1, and E-2."

72.    NST has satisfied all of its obligations under the attached Service Agreements.

73.    NST has made demand of Sigma Chi Corporation to make the total outstanding payments due of $78,456.43 to NST for the labor and materials provided.

74.    Sigma Chi Corporation has failed and refused to make said payments. Sigma Chi Corporation's failure and refusal to make the outstanding payments constitutes a material breach of the Service Agreements.

75.    Sigma Chi Corporation's refusal to make the outstanding payments is unreasonable and vexatious. NST is entitled to prejudgment interest on the outstanding payments at the rate of 5% per annum pursuant to 815 ILCS 205/2 as a result of Sigma Chi Corporation's unreasonable and vexatious delay of payment.

76.    As a result of Sigma Chi Corporation's breach of the Service Agreements, NST has been damaged in the amount of, at least, $78,456.43, plus statutory prejudgment interest as it accrues.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI Corporation, an Illinois not-for-profit corporation, in the amount of, at least, $78,456.43, plus statutory prejudgment interest as it accrues, all costs of suit, and such further relief as this Court deems appropriate and just.

### Count VII
### (Unjust Enrichment Against Sigma Chi Corporation – In the Alternative)

In the alternative, and without prejudice to its claims for breach of contract, Plaintiff alleges the following claim for Unjust Enrichment against Defendant, Sigma Chi Corporation.

77.    NST restates and realleges paragraphs 51 through 66 of Count V as and for its paragraph 77 of Count VII as though fully set forth herein.

78.     Sigma Chi Foundation and Sigma Chi Corporation induced NST to enter into the attached Service Agreements and provide the services contemplated thereunder to Sigma Chi Corporation by promising to pay NST for those services.

79.     NST reasonably relied on Sigma Chi Foundation's promises to pay the amounts due under the Service Agreements because NST had entered into other, similar agreements with Sigma Chi Foundation for the benefit of Sigma Chi Corporation for which Sigma Chi Foundation had and was making payments.

80.     In reliance on Defendants' promises of payment, NST entered into the Service Agreements with Sigma Chi Foundation for the benefit of Sigma Chi Corporation.

81.     NST furnished valuable services to Sigma Chi Corporation under the terms of the Service Agreements. NST satisfied all of its obligations under the Service Agreements.

82.     Sigma Chi Corporation received the valuable services furnished by NST under the terms of the Service Agreements.

83.     Under the foregoing circumstances, it would be unjust for Sigma Chi Corporation to retain the benefit of the services provided by NST without paying for said services.

84.     The value of the benefit received and retained by Sigma Chi Corporation from NST equals $78,456.43, plus statutory prejudgment interest as it accrues.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI CORPORATION, an Illinois not-for profit corporation, in the amount of, at least, $78,456.43, plus statutory prejudgment interest as it accrues, all costs of suit, and such further relief as this Court deems appropriate and just.

16

## Count VIII
### (Quantum Meruit Against Sigma Chi Corporation – In the Alternative)

In the alternative, and without prejudice to its claims for breach of contract, Plaintiff alleges the following claim for Quantum Meruit against Defendant, Sigma Chi Corporation.

85.     NST restates and realleges paragraphs 51 through 66 of Count V as and for its paragraph 80 of Count VIII as though fully set forth herein.

86.     Sigma Chi Foundation and Sigma Chi Corporation induced NST to enter into the Service Agreements and provide the services contemplated thereunder to Sigma Chi Corporation by promising to pay NST for those services.

87.     NST reasonably relied on Sigma Chi Foundation's promises to pay the amounts due under the Service Agreements because NST had entered into other, similar agreements with Sigma Chi Foundation for the benefit of Sigma Chi Corporation for which Sigma Chi Foundation had and was making payments.

88.     In reliance on Defendants' promises of payment, NST entered into the Service Agreements with Sigma Chi Foundation for the benefit of Sigma Chi Corporation.

89.     NST furnished valuable services to Sigma Chi Corporation under the terms of the Service Agreements.  NST satisfied all of its obligations under the Service Agreements.

90.     Sigma Chi Corporation received the valuable services furnished by NST under the terms of the Service Agreements.

91.     Under the foregoing circumstances, it would be unjust for Sigma Chi Corporation to retain the benefit of the services provided by NST without paying for said services.

17

92.    The reasonable value of the services furnished by NST and retained by Sigma Chi Corporation from NST equals $78,456.43, plus statutory prejudgment interest as it accrues.

WHEREFORE, Plaintiff, NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a. INCENTRA SOLUTIONS OF ILLINOIS, an Illinois corporation, prays that this Honorable Court enter judgment in its favor and against Defendant, SIGMA CHI CORPORATION, an Illinois not-for profit corporation, in the amount of, at least, $78,456.43, plus statutory prejudgment interest as it accrues, all costs of suit, and such further relief as this Court deems appropriate and just.

NETWORK SYSTEM TECHNOLOGIES, INC. d.b.a.
INCENTRA SOLUTIONS OF ILLINOIS, an Illinois
corporation, Plaintiff,

By: _____
One of Its Attorneys

Thomas G. Oddo
Coman & Anderson, P.C.
2525 Cabot Drive, Suite 300
Lisle, Illinois 60532
(630) 428-2660
Attorney Code: 27738

18

# EXHIBIT A

# GRIDWORKS MASTER SERVICES AGREEMENT

}

This Customer Agreement ("Agreement") for managed storage services as described in Exhibit A attached hereto and made a part hereof (the "Service") is entered into as of May 31st, 2006 (the "Effective Date") by and between Incentra Solutions, having its principal office at 12303 Airport Way, Suite 250, Broomfield, CO 80021 and SigmaChi ("Customer"), having its principal office at 1714 Hinman Avenue, Evanston, Il 60201 ("Customer").

Services set forth in this agreement to the Customer by **Incentra Solutions** and billing of such services shall begin as of July 1st, 2006 (the "Activation Date").

The initial term of this Agreement ("Initial Term") shall begin on the Activation Date and shall end Thirty-Six (36) months subsequent to the Activation Date. Subsequent to the Initial Term, this Agreement shall automatically renew for additional consecutive one year periods ("Renewal Term(s)") unless one party notifies the other party at least sixty (60) days prior to the expiration of the then-current term of its intention to not renew this Agreement.

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, and intending to be legally bound by this Agreement and the exhibits hereto, Customer and **Incentra Solutions** hereby agree as follows:

1.  **General:**

    Use of this Service consists of the right of a Customer of the Service ("Customer") to electronically transmit and store computer data using either a private data communications network, or the Internet Incentra Solutions and to retrieve said data should they be required. The Service is made available by Incentra Solutions to Customer during the period Customer maintains a paid subscription to the Service. Where software is required to provision access, Customer must accept, agree to and acknowledge such license by means of an on-line "click" prior to download, when delivered electronically, or through an enforceable "shrink-wrap" format.

2.  **Incentra Solutions Responsibilities:**

    2.1.  **Incentra Solutions** shall provide to Customer the services (the "Services") in accordance to the Service Levels set forth in Exhibit B ("Service Level Agreements") attached hereto.

    2.2.  **Incentra Solutions** reserves the right to immediately suspend or terminate affected Services and/or to remove Customer's content from **Incentra Solutions**'s storage device, if **Incentra Solutions** has reason to believe that Customer or End-User's content is or is likely to become non-compliant with any applicable law, regulation or policy, or is or is likely to become the subject of a lawsuit or material dispute. Incentra Solutions shall not be responsible for Customer's use of the Services or content, and **Incentra Solutions**'s action or inaction shall not be deemed review or approval of such use or content.

    2.3.  **Incentra Solutions** or its agents may make copies of all files stored as part of the back up and recovery of servers utilized in connection with some of the Services. Neither **Incentra Solutions** nor its agents shall be obligated to archive such copies and will utilize them only for backup purposes. They will not be accessible to Customer.

3.  **Customer's Responsibilities:**

    3.1.  Customer shall pay service fees and other charges incurred by Customer or Customer's designated users at the rates and on the terms in effect for the billing period in which those charges are incurred.

    3.2.  Customer shall not use the Service for storage, possession or transmission of any information, the possession, creation or transmission of which violates any state, local or federal law, including without limitation, stolen materials, obscene materials or child pornography. CUSTOMER'S BACKUP FILES MAINTAINED BY **Incentra Solutions** ARE SUBJECT TO EXAMINATION BY LAW ENFORCEMENT OFFICIALS OR OTHERS WITHOUT CUSTOMER'S CONSENT UPON PRESENTATION TO Incentra Solutions OF A SEARCH WARRANT OR SUBPOENA.

3.3.  Customer is responsible for and must provide all telephone and other equipment and services necessary to access the Service. Customer should maintain a primary electronic file of all materials stored in the Service. Customer should not utilize the service as a substitute for primary electronic file maintenance.

4.  **Compensation.**

4.1.  As compensation for **Incentra Solutions's** performance of the Services, Customer shall pay **Incentra Solutions** the fees indicated in Exhibit A Schedule 3 ("Pricing").

4.2.  Customer shall pay **Incentra Solutions** all Non-Recurring and Monthly Recurring fees indicated in Exhibit A Schedule 3. Monthly Recurring fees shall be for Customer services during the period beginning on the Activation Date and continuing throughout the Initial Term and any Renewal Term(s) of this Agreement.

4.3.  Customer shall pay **Incentra Solutions** all amounts due and payable under this Agreement without deduction, setoff or delay for any reason within thirty (30) days of the invoice date. In addition, Customer agrees to pay on all past due amounts interest of one and one-half percent (1 1/2%) per month from the due date or the highest rate permitted by law. Customer shall pay all applicable fees for Monthly Recurring Services monthly in advance

4.4.  Customer shall pay all applicable taxes related to Services provided hereunder, excluding taxes based on **Incentra Solutions's** net income.

5.  **Limited Performance Warranty.**

5.1.  **Incentra Solutions** will perform all Services in a professional manner, consistent with industry standards, and in accordance in all material respects with all applicable laws, rules, regulations and ordinances. In addition, **Incentra Solutions** will use commercially reasonable efforts to achieve and maintain the Service Levels set forth in Exhibit B attached hereto during the term of this Agreement.

5.2.  CUSTOMER EXPRESSLY AGREES THAT USE OF THE SERVICE IS AT CUSTOMER'S SOLE RISK. NEITHER **Incentra Solutions** NOR ANY OF THEIR LICENSORS, EMPLOYEES, OR AGENTS WARRANT THAT THE SERVICE WILL BE UNINTERRUPTED OR ERROR FREE; NOR DO **Incentra Solutions** OR ANY OF THEIR LICENSORS, EMPLOYEES OR AGENTS MAKE ANY WARRANTY AS TO THE RESULTS TO BE OBTAINED FROM USE OF THE SERVICE. THE SERVICE IS MADE AVAILABLE ON AN "AS IS" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE WARRANTIES WHICH ARE IMPLIED BY AND INCAPABLE OF EXCLUSION, RESTRICTION, OR MODIFICATION UNDER THE LAWS APPLICABLE TO THIS AGREEMENT.

6.  **Bailment**

6.1.  No bailment or similar obligation is created between Customer (and/or Customer's designated users) and **Incentra Solutions** with respect to Customer's stored data. Customer is solely responsible for maintaining the confidentiality of Passwords, including restricting the use of the Password by Customer's designated users. Customer shall be responsible for all use of the Service accessed through Customer's Password. **Incentra Solutions** SHALL NOT HAVE ANY RESPONSIBILITY OR OBLIGATION TO CUSTOMER, CUSTOMER'S DESIGNATED USERS, OR OTHER USERS OF THE SERVICE TO MONITOR, SUPERVISE OR OVERSEE THE CONTENTS OF FILES STORED ON THE SERVICE.

7.  **Survivability**

7.1.  The provisions of paragraphs 2.3, 3.3, 6.1, and 7.1 are for the benefit of **Incentra Solutions** and its respective Suppliers, Licensors, Employees, and Agents; and each shall have the right to assert and enforce such provisions directly on its own behalf.

8.    **Limitation of Liability.**

    8.1.    NEITHER Incentra Solutions NOR ANYONE ELSE INVOLVED IN CREATING, DELIVERING OR MAINTAINING THE SERVICE SHALL BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF USE OF THE SERVICE OR INABILITY TO USE THE SERVICE OR OUT OF ANY BREACH OF ANY WARRANTY. IN NO EVENT WILL Incentra Solutions'S NOR ANY OF ITS LICENSORS', EMPLOYEES', OR AGENTS' LIABILITY FOR ANY CLAIM, WHETHER IN CONTRACT, TORT OR ANY OTHER THEORY OF LIABILITY, EXCEED THE AMOUNTS PAID BY CUSTOMER, IF ANY, FOR THE SERVICE FOR THE TWELVE MONTH PERIOD PRECEDING THE EVENT FORMING THE BASIS OF THE CLAIM.

    8.2.    ANY ACTION AGAINST Incentra Solutions MUST COMMENCE WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES.

9.    **Indemnification.**

    9.1.    Customer agrees that it shall indemnify, defend and hold harmless **Incentra Solutions** and its respective officers, directors, employees and agents (collectively, the "Indemnities"), from and against any and all third party damages, claims, losses, expenses, costs, obligations and liabilities (including without limitation reasonable attorney's fees) ("Damages"), suffered directly or indirectly by any of the Indemnities by reason of or arising out of this Agreement, including without limitation any Damages related to use of the Services by Customer.

10.    **Confidentiality and Non-Disclosure.**

    10.1.    Each party acknowledges that by reason of its relationship to the other party under this Agreement it may have access to certain information and materials concerning the other party's business, plans, customers, technology, and products that are confidential, proprietary and of substantial value to such party ("Confidential Information"), which value would be impaired if such Confidential Information were disclosed to third parties.  Each party agrees to maintain in confidence all Confidential Information received from the other and agrees not to disclose or otherwise make available such Confidential Information to any third party without the prior written consent of the Disclosing Party. Each party agrees to use the Confidential Information only for the purpose of performing this Agreement. No Confidential Information shall be deemed confidential unless so marked if given in writing or, if given orally, identified as confidential prior to disclosure and reduced to a writing marked confidential and delivered to the Receiving Party within thirty (30) days of initial disclosure.

    10.2.    Confidential Information does not include any items which can be demonstrated to have been (i) previously known to the Receiving Party, other than through its relationship with the Disclosing Party, without a confidentiality restriction on the use of such information, (ii) independently developed by the Receiving Party as established by competent evidence, (iii) rightfully acquired by the Receiving Party from a third party with full legal right to disclose such information, (iv) approved for disclosure by the Disclosing Party pursuant to this Agreement, (v) part of the public domain through no breach of this Agreement or (vi) required by law to be disclosed.

    10.3.    The provisions of this Section shall survive the expiration or termination of this Agreement for a period of one (1) year.

11.    **Proprietary Information and Ownership.**

    11.1.    Software provided by third parties remains the sole property of the respective third party, subject to the terms and conditions of any applicable third party license agreement.

    11.2.    Termination. Either party may terminate this Agreement for any material breach of the Agreement that is not cured to the non-breaching party's satisfaction within thirty (30) days of written notice that specifies the breach.

12.    **Governing Law.**

    12.1.    This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado and each party agrees to be subject to the jurisdiction of the Courts of the State of Colorado or the Federal District Court for the District of Colorado.  If any provision of this Agreement shall be invalid or unenforceable, the remainder of the Agreement shall not be affected and shall be enforced to the extent permitted by law.

13.    **Incorporation: Entire Agreement.**

    13.1.    This Agreement, including the main body of this Agreement and any and all Addenda, Exhibits or Attachments which have been agreed to and executed by an authorized representative of each party hereto, represent the entire agreement between the parties, and supercede all prior agreements. No modification of this Agreement will be effective, except by a writing signed by both parties. Notwithstanding any acknowledgment of an Customer purchase order by Incentra Solutions, any provision or condition in any purchase order, voucher, letter or other memorandum of the Customer which is in any way inconsistent with, or adds to, the provisions of this agreement is null and void. Neither the course of conduct between parties nor trade practice shall act to modify the provisions of this Agreement. If any provision of this Agreement is determined to be invalid, all other provisions shall remain in full force and effect.

    IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have duly executed this Agreement as of the date first above written.

Incentra Solutions

By: _____

Title: _VP-OPERATIONS_

Date: _JUNE 9, 2006_

Sigma Chi

By: _____

Title: DIRECTOR OF IT

Date: 8 JUNE 2006

# EXHIBIT A

## Services

The following is a brief description of the Services. Further details are outlined in the following schedules to this Exhibit A:

Schedule A-1: Monitor & Alert Notifications and Reports
Schedule A-2: Supported Storage Hardware and Applications
Schedule A-3: Pricing
Schedule A-4: Description of On-Demand Services
Schedule A-5: Bill of Materials

## GridWatch

### BASIC DESCRIPTION

GridWatch is a storage Monitor, Alert and Notification service that is run by the Network Storage Operations Center (NOC) in Broomfield, CO. The NOC is staffed 24x7 to monitor the status, performance and operations of the customer's data protection systems to ensure they are functioning properly.

This includes monitoring of Storage Area Networks (SAN) infrastructures, Network-Attached Storage (NAS) systems, primary and secondary storage devices, storage and backup servers and storage-related applications. GridWatch monitors the physical data protection infrastructure down to the individual subsystem elements, including SAN & IP switches, firewalls, routers, disk arrays, servers, tape libraries, tape drives, etc.

GridWatch reports the completion of activities, such as scheduled backup jobs, and automatically generates alerts when problems are detected. From these alerts, NOC staff can pinpoint the exact nature and location of problems and provide a description of the problem to the customer. These notifications detail the failure mode and the component(s) involved, and provide recommended steps for further troubleshooting the problem.

When an alert occurs, the NOC staff will follow a customer-specific notification plan.

## GridWatch Vendor Plus

### BASIC DESCRIPTION

GridWatch Vendor Plus adds the proactive management of 3rd party maintenance to the monitor/alert/notification service of GridWatch. Since the NOC is monitoring the data protection infrastructure at all times, and is alerted when there is a problem, it is in the best position to notify and dispatch maintenance vendors when a hardware failure is detected.

The NOC staff will communicate with the maintenance provider in order to assist the provider in determining the root cause of the problem more quickly and put them in a better position to fix the problem as quickly as possible.

Vendors will also be held accountable for their SLA requirements, such as responding on-site within the contracted response time of being notified of a hardware problem.

Throughout the repair process, the NOC will keep the customer updated on the status of the situation, as specified in the escalation procedures agreed to by the customer. This provides the customer with a single point of contact for problem resolution, even when the problem involves multiple vendors. With GridWatch Vendor Plus, hardware failures will be managed from detection through to resolution, all without customer involvement.

# GridManage and GridManage Certified

## BASIC DESCRIPTION

GridManage builds on the GridWatch monitoring, alert and notification platform by adding complete operation and management of the storage application layer and providing a professionally monitored, managed, operated and maintained data storage and data protection solution.

## GRIDMANAGE SEVERITY CODE DEFINITIONS

MSI's GridManage builds on the GridWatch monitoring, alert and notification platform by adding complete operation and management of the storage application layer and providing a professionally monitored, managed, operated and maintained data storage and data protection solution.

When the MSI Storage NOC receives an alert regarding a managed system, and determines that a service call is required to resolve the problem, they will assign a Severity Level. The Severity Level is based on a set of defined criteria that determines what actions need to be taken and the time frame requirements for each action.

Our four Severity Levels are defined below along with the Severity Response Matrix that sets the expected response times and update intervals. The customer will be notified and updated until the problem is resolved or the severity is downgraded. The update intervals are MSI NOC standards unless a customer has requested a custom update interval schedule.

- **Severity Level 1:**

    A data protection service is non-operational, resulting in a critical system condition requiring immediate resolution.

- **Severity Level 2:**

    A data protection service is operational, but with severely restricted or degraded functionality.

- **Severity Level 3:**

    A data protection service is operational, but with functional limitations or restrictions that are not critical to the overall system operations.

- **Severity Level 4:**

   *Questions arise associated with service implementation or performance or there are requests for changes to the service.*

**SEVERITY RESPONSE MATRIX**

| INFRASTRUCTURE | SEVERITY LEVEL | NOTIFY (Hours) | UPDATE INTERVAL (Hours) |
|---|---|---|---|
| DISK | 1 | .5 | 1 |
|  | 2 | 1 | 2 |
|  | 3 | 4 | 24 |
|  | 4 | 24 | 48 |
| TAPE | 1 | .5 | 2 |
|  | 2 | 2 | 4 |
|  | 3 | 4 | 24 |
|  | 4 | 24 | 48 |

## GRIDMANAGE CERTIFIED

To attain GridManage Certified status, the customer must contract separately for performance of a Storage Infrastructure Assessment. This assessment will report any deficiencies in the infrastructure design and recommend changes that need to be implemented before certification can be assigned. Once certified, the customer will receive, at no additional charge:

- An SLA that guarantees 98% of all backup operations will complete successfully and within the allotted time window, and
- An SLA that guarantees 100% of all NOC-initiated restore operations will be started within 30 minutes of the receipt of a restore request by the NOC, and will complete successfully, provided there are no other restores in progress and the required tape cartridge(s) are located within a managed automated library.

# GridComplete

## BASIC DESCRIPTION

GridComplete is a total data protection solution that provides guaranteed levels of availability, capacity, performance, and protection. GridComplete is a fully managed, turnkey service using a type of storage-on-demand utility model and configured with the latest technologies, including SAN, NAS, and a variety of data protection systems, all tailored to the specific needs of the customer.

GridComplete solutions may be hosted at a customer-provided private data center, or can be set up in one of the many public data centers worldwide. The GridComplete solution will be continuously managed and monitored to ensure applications meet stringent SLAs similar to those the in GridManage Certified service.

GridComplete includes all of these services:

- 24x7 monitoring, alert, and notification of service vendors
- Management of all hardware and software maintenance contracts
- Tracking and implementation of all hardware and software upgrades, patches, and Field Change Orders
- Total responsibility for working with 3rd party vendors to resolve problems
- Backup & Restore operations
- Vaulting and Tape Rotation
- Load balancing and disk provisioning
- Guaranteed SLAs (see Service Level Agreements section for details)

Reseller takes responsibility for all aspects of managing and maintaining the health of the GridComplete storage infrastructure and for ensuring that all data is fully protected. After the customer determines its needed capacity, the remainder of the solution is managed by Reseller.

A GridComplete implementation begins with a complete professional assessment of the customer's requirements, including current and planned applications and associated storage capacity requirements. Data protection, availability, and performance requirements will be determined and agreed upon. A storage system will then be designed to meet these requirements, using as much of the customer's existing hardware and software as possible. Other components, including software, servers, routers, switches, disk subsystems and tape libraries will be purchased or leased to complete the design. The customer may acquire these components directly from DataLink, or may choose to take advantage of Reseller's buying power and financing/leasing terms (12, 18 or 24-month terms).

# <u>Schedule A-1</u>: Monitor and Alert Notifications & Reports

| | Severity | GridWatch | GridWatch Vendor Plus | GridManage | GridComplete |
|---|---|---|---|---|---|
| **Backup & Restore** | | | | | |
| Job status alarms | | | | | |
| Job failures with error codes, text definitions and troubleshooting steps | 3 | X | X | X | X |
| Partial Backups (open files) - DBs and Fulls | 3 | X | X | X | X |
| Pending jobs overrun scheduled start times | 4 | | | X | X |
| Jobs exceed average run time | 4 | | | X | X |
| Partial Backups (open files) - Inc's | 4 | X | X | X | X |
| Component alarms | | | | | |
| Notify Library failure | 1 | X | X | X | X |
| Manage Library Failure | 1 | | | X | X |
| Notify Backup Server failure | 1 | X | X | X | X |
| Manage Backup Server Failure | 1 | | | X | X |
| Notify Media mount failure | 2 | X | X | X | X |
| Manage Media mount failure | 2 | | | X | X |
| Notify Drive failure | 2 | X | X | X | X |
| Manage Drive failure | 2 | | | X | X |
| Notify Backup Server performance thresholds (memory, CPU) | 2 | X | X | X | X |
| Manage Backup Server performance thresholds (memory, CPU) | 2 | | | X | X |
| Notify Backup server health thresholds (Power, memory, CPU, NIC) | 2 | X | X | X | X |
| Manage Backup server health thresholds (Power, memory, CPU, NIC) | 2 | | | X | X |
| Notify Backup Network (Port offline/ off-line events) | 2 | X | X | X | X |
| Manage Backup Network (Port offline/ off-line events) | 2 | | | X | X |
| SLA violations | | | | | |
| Notify Consecutive failures on backup or restore | 3 | X | X | X | X |
| Manage Consecutive failures on backup or restore | 3 | | | X | X |
| Notify Consecutive missed windows | 3 | X | X | X | X |
| Manage Consecutive missed windows | 3 | | | X | X |
| Manage Load Balancing | 3 | | | X | X |
| Library slots | | | | | |
| Scratch pool with no media | 1 | X | X | X | X |
| Available tapes in scratch pool | 2 | X | X | X | X |
| Drive utilization | 2 | | | X | X |
| Off-Site Tapes | | | | | |
| Notification of tapes to go off-site | 3 | X | X | | |
| Management of tapes to go off-site | 3 | | | X | X |
| Notification of tapes returning from off-site | 3 | X | X | | |
| Management of tapes returning from off-site | 3 | | | X | X |
| **SAN & Disk Management** | | | | | |
| Disk Array | | | | | |
| Notify Interface port failure | 1 | X | X | X | X |
| Manage Interface port failure | 1 | | X | X | X |
| Notify Controller failure | 1 | X | X | X | X |
| Manage Controller failure | 1 | | X | X | X |
| Notify Drive failure | 2 | X | X | X | X |
| Manage Drive failure | 2 | | X | X | X |
| Notify Power supply failure | 2 | X | X | X | X |
| Manage Power supply failure | 2 | | X | X | X |
| Notify Fail-over event | 2 | X | X | X | X |
| Manage Fail-over event | 2 | | | X | X |
| Notify Utilized vs. allocated capacity thresholds (90%>) | 2 | X | X | X | X |
| Manage Utilized vs. allocated capacity thresholds (90%>) | 2 | | | X | X |
| Notify Utilized vs. allocated capacity thresholds (<90%) | 3 | X | X | X | X |
| Manage Utilized vs. allocated capacity thresholds (<90%) | 3 | | | X | X |
| SAN Fabric Health | | | | | |
| Notify Interface port failure | 1 | X | X | X | X |
| Manage Interface port failure | 1 | | X | X | X |
| Notify Controller failure | 1 | X | X | X | X |
| Manage Controller failure | 1 | | X | X | X |
| Notify Power supply failure | 2 | X | X | X | X |
| Manage Power supply failure | 2 | | X | X | X |
| Notify Fail-over event | 2 | X | X | X | X |
| Manage Fail-over event | 2 | | | X | X |
| Notify Port capacity thresholds (90%>) | 2 | X | X | X | X |
| Manage Port capacity thresholds (90%>) | 2 | | | X | X |

## GridWorks Services Reports

| GridWorks Reports | GridWatch | GridWatch Vendor Plus | GridManage | GridComplete |
|---|:---:|:---:|:---:|:---:|
| **Tape** | | | | |
| Job Status | X | X | X | X |
| Backup | X | X | X | X |
| Restore | X | X | X | X |
| Inventory | X | X | X | X |
| Off-Site | | | X | X |
| Load Balancing | | | X | X |
| Topology | | | X | X |
| Active Jobs | | | X | X |
| SLA Report | | | X | X |
| Window Adherence | | | X | X |
| **Disk** | | | | |
| Utilization | X | X | X | X |
| Topology | X | X | X | X |
| Inventory | X | X | X | X |
| Availability | X | X | X | X |
| **Switch** | | | | |
| Performance | X | X | X | X |
| Inventory | X | X | X | X |
| Router Graph | | | X | X |
| **Tickets** | | | | |
| Tracking | X | X | X | X |
| Classify Failure | | | X | X |
| Classify Availability | | | X | X |

## SCHEDULE A-2: SUPPORTED STORAGE HARDWARE AND APPLICATIONS

Backup Applications:
       Veritas NetBackup 3.4 and 4.5
       CommVault Galaxy 4.2 and 5.0
Tape Libraries:
       STK
       Quantum
       ADIC
       Sun L
       SpectraLogic
Tape Drives:
       DLT
       SDLT
       LTO
       STK 9X40
Disk:
       EMC Symmetrix & Clariion
       HDS 9XXX
       HPQ RA-Series
       SUN T3 and A-Series
       NetApp F-Series
       HDS
       XIOtech
Disk-2-Disk Backup:
       Quantum DX30
       NTAP R150
SAN Fabrics:
       Brocade
       McDATA
IP Network Devices:
       Cisco
       NetScreen

## Schedule A-3 – Pricing GridManage

| | |
|---|---|
| GridManage Backup Management with EFS vendor management services | $3895/month |
| Additional Software over 1TB | $1.07/PGB |
| Additional Management over 1.5TB | $0.75/PGB |
| GridWatch for servers | $5/mo per server |
| Gridwatch for router/switch | $10/mo per device |
| One time setup fee/server installs | $6,500 |

# On-Demand Services Pricing

| Services | Charge for Event | Applicable to the Following GridWorks Services | | | |
|---|---|---|---|---|---|
| | | GridWatch | GridWatch V+ | GridManage | GridComplete |
| Hot Backup Database Scripting | $215/hr | X | X | X | X |
| Add New Switch | Professional Services- $150/hr NOC, $250/Engineering | X | X | X | X |
| Add New Array | Professional Services- $150/hr NOC, $250/Engineering | X | X | X | X |
| GridWorks Login | $50/request after first 5 requests (multiple IDs can be accommodated in each request) | X | X | X | X |
| On-Demand Professional Services & Miscellaneous Maintenance | $150/hr NOC, $250/Engineering, Assessment = $10K, GridManage Certification/Design =$15K | X | X | X | X |
| 3rd Party Maintenance Dispatch | 6 Dispatch events included with Service, $400/dispatch | | X | X | X |
| Server Install - ColoStor/RemoteStor | $150  File System $250 Database | | | X | X |
| Server Install - Disk | $300 Single, $500 Dual Attached | | | X | X |
| Server De-Install | $50 | | | X | X |
| Unscheduled Backup | $50 | | | X | X |
| Media Replication | $150 | | | X | X |
| Restore  Request  - NOC Initiated (plus Tape Recall charge) | $150 per restore | | | X | X |
| Tape Recall -Offsite Vaulting | ($300/$150)  5hr & 25 hr | | | X | X |
| Add New Path | $300 | | | X | X |
| Provision New LUN | $150 | | | X | X |
| Switch Zoning | $150 | | | X | X |

## Off-Site Vaulting Pricing
Pricing to be quoted upon evaluation of archiving and retention needs.

Confidential & Proprietary

# Schedule A-4 - On-Demand Services

## BASIC DESCRIPTION

Customer will be provided, for an additional charge, a complete set of ad-hoc services to complement the GridWorks Suite. These services can be ordered online through the GridWorks Portal or by calling our 24x7 NOC. The following is a brief description of each service. Pricing details are in the On-Demand services table and may be acquired from your Account Executive.

Hot Backup Database Scripting: The scripts necessary to properly backup and protect database records without requiring the database application to be shut down or taken off-line for backup are written. Hot Backup is essential for 24-hour applications such as e-commerce transaction systems.

Add New Switch: Download appropriate monitoring agent software and set up and test communications to ensure the new switch is visible to the NOC.

Add New Array: The NOC will download appropriate monitoring agent software and set up and test communications to ensure the new array is visible to the NOC.

GridWorks Login: The customer is entitled to request 5 user Login IDs with the initial implementation of a GridWorks service. The NOC will accommodate further Login ID requests that will be billed on a per-request basis (multiple IDs can be made on a single request).

On-Demand Professional Services & Miscellaneous Maintenance: Professional Services and NOC Engineers are available 24x7 to assist with system assessment, design, troubleshooting, and other storage-related issues. Billing rates are determined by the engineering level required (PS or NOC) and the type of services rendered.

3rd Party Maintenance Dispatch: With the GridWatch Vendor Plus Service and above, the NOC will provide up to 6 dispatch calls to 3rd party maintenance companies per month. Additional dispatch events in a given month will be billed on a per-event basis.

Server Installation – Tape: The NOC will download appropriate file system and monitoring agent software and set up and test communications to ensure the new server is visible to the NOC.

Server Installation – Disk: The NOC will download appropriate file system and monitoring agent software and set up and test communications to ensure the new server is visible to the NOC. Fail over software and HBAs are the responsibility of the customer and are not included.

Server De-Install: The NOC will take the necessary steps to remove the requested server from the monitoring/management environment.

Unscheduled Backup: The NOC will initiate a backup within 30 minutes of the time requested.

Media Replication: The NOC will issue the commands necessary to copy the contents of one tape onto a scratch tape, and then eject the tape from the library.

Restore Request (NOC Initiated): GridManage and GridComplete include customer submitted Restores (completed service order for restore in GridWorks portal), with each restore being initiated within 30 minutes of the NOC receiving the request. The NOC can assist and troubleshoot restores on-demand for a non-recurring fee.

<u>Tape Recall From Off-Site Vaulting</u>: Unscheduled retrieval of a tape from an off-site vault will be performed within either 5 hours or 25 hours, depending on the request.

<u>Add New Path</u>: The NOC will take the steps necessary to reconfigure the customer's network to accommodate a new data path and add it to the managed environment.

<u>Provision New LUN</u>: The NOC will take the steps necessary to reconfigure a customer's storage array to accommodate a new LUN and add it to the managed environment.

<u>Switch Zoning</u>: The NOC will take the steps necessary to reconfigure the customer's network to accommodate a change in zoning, and make the necessary adjustments in the management environment.


## OFF-SITE TAPE VAULTING – AD HOC SERVICE

Off-site tape vaulting is available for an additional charge. Pricing will be quoted upon evaluation of specific customer archiving and retention needs.

Off-Site Tape Vaulting is facilitated as a part of the managed services. With GridManage, Reseller can manage to your existing schedules or contracts or implement the service for you. Off-site vaulting is typically used for the month-end and/or quarter-end full backup copy, any 3 of the full backup generations retained in the 14-day retention cycle, or each full backup copy as it rolls out of the 14-day cycle.

The service includes setting up the eject volume pools, running eject jobs to eject the cartridges out of the automated tape library, managing customer provided remote hands to move the cartridges off to a secure off-site facility, and placing them into manually managed tape racks. The full backups targeted for off-site vaulting are automatically written to an individual cartridge. Vaulting can be scheduled weekly or monthly.    Special schedules can be accommodated and priced accordingly.   Technology refresh will be addressed annually with the customer to determine if a tape refresh for long term (3+ years) off-site media is necessary and will be priced according to the project scope.

On a restore, the appropriate cartridges are identified and retrieved from the off-site facility tape racks, sent back to the appropriate data center, entered back into the automated tape library, and the data restored back to the appropriate client server.

Unscheduled retrievals can be requested with 5 hour and 25 hour intervals with the associated charges applied. The customer specifies the retention period for vaulted media at set-up time. Upon expiration, the tape cartridges are automatically returned to the appropriate data center for re-use or disposal, per the customer's tape usage policies.


Using the GridWorks Portal, users have access to scheduling for off-site tape rotation, including scratch tapes, tapes defined for off-site, tapes on-shelf, tapes in the vault and those scheduled for return.

## Schedule A-5 – Bill of Materials



**BOM**   **Customer: Sigma Chi**

### DESCRIPTION

**Network Infrastructure**
Firewall-Cisco PIX 501, 10 Users

**Software**
**CommVault Backup Servers**
CommServe/Media Agent **Bundle** (1 Drive license)
**Drive** Management Software, per Drive

**Media**
LTO-2 Tapes
LTO Cleaning Tapes

**Maintenance: 3 Years** - 24x7x4 unless noted
Firewall - 501 - 10 Users
Backup Software (21%)

# EXHIBIT B
## Service Level Agreements (SLAs)

MSI offers a broad range of storage management services and backs up these services with stringent guarantee. These guarantees, and the remedies that MSI will refund to the customer in the cases where MSI fails to meet its obligations, through its own fault or negligence, are detailed in the Service Level Agreements that accompany each of MSI's Service Contracts. Remedy limits are by physical customer site, and accrued for respective site-specific violations only. If MSI fails to meet any SLA performance criteria in any month for a particular location, the remedy will be a service credit towards the monthly service fees for the specific customer site impacted, regardless of consolidated billing or pricing for multiple locations. SLA Limit: Total service credits will not exceed 50% of the total service fees for that month per associated to a particular customer site.

The following is an overview of each SLA. Note, however, that these descriptions are for general education purposes and do not supersedes the terms and conditions found in the actual SLA contract documents.

| SLAs | GridWatch | GridWatch Vendor Plus | GridManage | GridManage Certified | GridComplete |
|---|---|---|---|---|---|
| Monitor/Alert/ Notify | x | x | x | x | x |
| GridWorks OSS Availability | x | x | x | x | x |
| GridWorks Portal Avail. | x | x | x | x | x |
| 3rd Party Vendor Management | | x | x | x | x |
| Successful Backup Window | | | | x | x |
| Completed Scheduled Backup Jobs | | | | x | x |
| Start Restore Request | | | x | x | x |
| Retention & Restore | | | | x | x |

## Monitor/Alert/Notify

Performance Criteria – Where MSI has been contracted for Monitor/Alert/Notify services (GridWatch Level 1 & above); MSI will notify the Customer within 30 minutes of receiving an event from the customer infrastructure.

Remedy – If MSI fails to meet this performance criterion in any month the remedy will be a service credit towards the total monthly fee for that month at the Customer Site affected. The credit will be calculated at $100 per missed event and the credit will be given on the following billing cycle, with total service credits to not exceed the SLA limit of total monthly billings of the particular customer site.

## 3rd Party Vendor Maintenance

Performance Criteria - Where MSI maintains the agreements with the 3rd party hardware component suppliers (GridWatch Vendor Plus & above), MSI will ensure that the 3rd party vendor is notified and on-site resources are notified within 30 minutes of the MSI Storage NOC identifying and opening a trouble ticket on service-level-impacting hardware problems. Where the Customer maintains the agreements with the 3rd party software suppliers, MSI will ensure that resources are contacted and dispatched on-site according to the terms and conditions of the Customer/3rd Party Supplier agreement. MSI will make best efforts to manage the 3rd party vendor to their contracted commitments and will escalate accordingly if vendor is non-responsive.

Remedy – If MSI fails to meet these performance criteria in any month; the remedy will be a service credit towards the total monthly fee for that month at the customer site affected. The credit will be calculated at $100 per missed event and the credit will be given on the following billing cycle, with total service credits to not exceed the SLA limit of total monthly billings of the particular customer site.

## GridWorks OSS Monitor & Management Availability

Performance Criteria – MSI guarantees customers 99.99% availability of the GridWorks operational support systems that the MSI Storage NOC utilizes to deliver on-going monitoring and management of storage infrastructures. GridWorks availability will be defined as the MSI visibility through NOC monitoring systems, but does not include (a) any Scheduled Maintenance Outage; (b) any event caused by the acts or omissions of a Customer or by the Customer's equipment; (c) Customer's failure to advise MSI of material or relevant changes to Customer's infrastructure (i.e. installation or upgrade of software and/or hardware); (d) interruption or failure of Customer services, or (e) Force Majeure. The end-customer viewing portal is defined separately as the front portal does not impede MSI to deliver on-going monitoring and management of storage infrastructures for our customers.

Remedy – If MSI fails to meet this performance criterion in any month; the remedy will be a service credit towards the total monthly service fees for that month. The percentage credit will be equal to the number of hours in violation divided by the number of hours in the month.

## GridWorks End Customer Portal Availability

Performance Criteria – MSI guarantees customers 98% availability to the end-customer web portal. The end-customer viewing portal is defined separately as the front portal does not impede MSI to deliver on-going monitoring and management of storage infrastructures for our customers. GridWorks end-portal availability service level agreement does not include (a) any Scheduled Maintenance Outage; (b) any event caused by the acts or omissions of a Customer or by the Customer's equipment; (c) Customer's failure to advise MSI of material or relevant changes to Customer's infrastructure (i.e. installation or upgrade of software and/or hardware); (d) interruption or failure of Customer services, (e) customer network connection to MSI is disabled or (f) Force Majeure.

Remedy – If MSI fails to meet this performance criterion in any month; the remedy will be a service credit towards the total monthly service fees for that month. The percentage credit will be equal to the number of hours in violation divided by the number of hours in the month.

## Successful Backup Window Attainment

Performance Criteria – Where MSI has been contracted for managed services (GridManage Certified & GridComplete), MSI will successfully manage 98% of all scheduled and re-scheduled file system backup jobs or database backup classes within their agreed upon scheduled windows.

Note – Re-scheduled start times may be the result of failed backup jobs or end-user request. The re-scheduled start time is mutually agreed upon between the MSI Storage NOC and the customer.

Remedy – If MSI fails to meet these performance criteria in any month the remedy will be a service credit not to exceed the SLA Limit. The percentage of successfully completed jobs within the window is based on the total number of successfully completed backup jobs divided by the total scheduled backup jobs for a particular site for the given calendar month. For example if there were 100 scheduled jobs and 95 are successful, then a 95% successful within in the window would be referenced in the below chart.

| Monthly Successful Backup Jobs Window Attainment | Monthly Service Credit (% Of Monthly Fee) |
|---|---|
| 98% ≤100% | 0% |
| 90% < 98% | 5% |
| 80%<90% | 10% |
| 70%<80% | 20% |
| < 70% | 25% |

## Complete Scheduled Backup Jobs

Performance Criteria – Where MSI has been contracted for in data center managed services, MSI will successfully complete 98% of all scheduled and re-scheduled file system backup jobs or database backup classes within 24 hours of the actual start time.

Remedy – If MSI fails to meet these performance criteria in any month the remedy will be a service credit not to exceed the SLA Limit. The percentage of successfully completed jobs within the window is based on the total number of successfully completed backup jobs divided by the total scheduled backup jobs for the given calendar month for that particular customer site.

| Monthly Successful Backup | Monthly Service Credit |
|---|---|
| 98% ≤100% | 0% |
| 90% < 98% | 5% |
| 80%<90% | 10% |
| 70%<80% | 20% |
| < 70% | 25% |

## Start Restore Requests

Performance Criteria – Where MSI has been contracted for managed services (GridManage & above), MSI will schedule and start requested restore jobs within 60 minutes of receipt of the request by MSI Storage NOC, provided no other restore operations are in progress, and the required cartridge(s) physically reside within an MSI-managed automated library.

Note – For database restores, the customer Database Administrator must be available to assist in the restore process, and must have the Database Management System (DBMS) in a working state prior to requesting the restore.

Remedy – If MSI fails to meet this performance criteria in any month the remedy will be a service credit not to exceed the SLA limit of the actual billing fees for that month for that particular site. The credit will be calculated at $100 per missed restore request and the credit will be given on the following billing cycle Retention and Restore

## Retention & Restore

Performance Criteria – Where MSI has been contracted for managed services, MSI will be able to restore any file or database backed-up with the retention period (typically 14 days).

Remedy – If MSI fails to meet this performance criteria in any month the remedy will be a service credit equal to 100% of the actual monthly billing for the specific backup job size times their contracted per/GB rate.

## On-Demand Services

MSI strives to meet the following performance criteria for all our on-demand services.

| On-Demand Service | Performance Criteria |
|---|---|
| Add New Server | Start installation within 2 hours of mutually agreed upon install time. |
| De-install Server | Start de-installation within 2 hours of mutually agreed upon de-install time. |
| Re-Install Server | Start re-installation within 2 hours of mutually agreed upon re-install time. |
| Disk Ad-Hoc Services | Provision new hosts with in 7 days of of mutually agreed upon install time |
| Unscheduled Backup | Start scheduled or re-scheduled file system backup jobs or database backup classes within 1 hour of scheduled start time if system resources and tape are available. |
| Unscheduled Off-Site Tape Recall | Have the requested tape cartridges back to the appropriate facility within the contracted time period (i.e. 5 hours or 25 hours) of the receipt of the request. |
| Change Policy | Complete change request order within 24 hours of receipt of request. |
| Provision New GridWorks Logon-ids | Completed within 72 hours of receipt of request. |

## *SLA Limitations*

MSI's ability to meets any of its SLAs may be negatively impacted by (a) any event caused by the acts or omissions of a Customer or End-User, or by the Customer's or End-User's equipment; (b) Customer's or End-User's failure to advise MSI of material or relevant changes to Customer's or End-User's infrastructure (i.e. installation or upgrade of software and/or hardware); (c) interruption or failure of Customer's services, or (d) Force Majeure. When an SLA violation event affects multiple SLA categories the remedies are not cumulative and the largest impact remedy will be credited to the customer. Acts of omission in "(a)" above cover activities beyond the control of MSI that may impact MSI's ability to meet the SLA. These limitation examples are provided below:

- The volume of data backed up exceeds 110% of the average volume for the same job over the prior 14 calendar days or the same growth of the incremental job over the same period
- Data files are left open and are not available to backup
- Unresponsive Customer to notifications and alerts by the MSI storage NOC which can be due to email unavailable, customers network or systems unavailable,
- 3rd Party Vendors are unresponsive and cooperative
- Customer owned assets are unavailable for storage management
- Customer or other provided hardware, software or connectivity products not provided by MSI.
- Customer owned assets have been changed or re-configured without MSI notification
- General equipment failures such as tape drive or robotics, disk array failures or failure of networking components
- Streaming speed varies due to work-load contention on the infrastructure
- Communications circuit unavailability or degradation for connectivity to MSI systems

Should any of these conditions cause MSI to fail an SLA commitment, such failures shall not be considered SLA failures for purposes of measuring MSI's performance and remedies for SLA failures shall not apply as to any failures caused by such conditions.

# EXHIBIT C
# Equipment Option

Customer shall have the option to purchase the equipment listed below (the "Leased Equipment") according to the pricing below. Sale of the equipment will be as-is, where-is.

If this option is exercised at the end of the Initial Term of the contract, payment will be $1.

The Leased Equipment shall consist of the following:

Cisco PIX 501 Firewall
25 – LTO2 tape media

In the event that either: (a) MSI shall cease to operate in the normal course of business due to insolvency, bankruptcy or liquidation; or (b) this SLA or the Agreement is terminated prior to the end of its term, e.g. a termination by Customer for material breach by MSI, and Customer is not in material default; then Customer shall have the option to purchase the equipment listed above for a one-time payment equal to $__1___ x the number of months remaining in the Initial Term or the then current Extended Term plus any one-time payment as described in the payment schedule above. In the event Customer is in material default at the time of an early termination, Customer shall have thirty (30) days from the date of termination to cure such default and thereby preserve the equipment purchase option provided herein.

In the event Customer exercises its option to purchase the Leased Equipment, upon such purchase, title shall pass to Customer and MSI shall, to the extent allowed by the equipment manufacturer, assign the manufacturers' warranties for such equipment to Customer.

10/05/06  14:39 FAX 630 904 9601        NETWORK SYSTEM TECH              ☒002
10/05/2008 14:09 FAX 8478694906         Sigma Chi HQ                    ☒002

# AMENDMENT TO MASTER SERVICE AGREEMENT

This Amendment to Master Service Agreement and Schedules is made as of the 15th day of September, 2006 (the "Effective Date"), by and between Sigma Chi ("Customer") and Incentra Solutions, Inc.

## RECITALS:

A.  The parties entered into a certain Master Service Agreement and MSA Enterprise Schedules ("MSA Agreement") effective as of May 31st, 2006. Capitalized terms used in this Amendment and not defined herein shall have the meanings given in the Master Service Agreement.

B.  The parties now desire to amend the Master Service Agreement and MSA Enterprise Schedules as set forth herein.

## AGREEMENT:

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sigma Chi and Incentra Solutions hereby agree as follows:

1.  The following is **added** to Exhibit A Schedule 3 ("Pricing") of the MSA Enterprise Schedules.

GridManage Disk Management
   Pricing for GridManage Disk management of up to 2TB of allocated storage shall be included in the IBM Credit ValuePlan Lease contract with the equipment listed below in Table A. All allocated storage over 2 TB will be billed directly to Sigma Chi at the rate listed below.

Additional Disk Management over 2TB    $.88/per GB

This pricing is based on allocated ("presented") storage. The customer provided equipment in which Incentra Solutions shall manage is listed below in Table A.

## TABLE A

NetApp FAS3020 ISCSI BASE
NetApp CIFS Software
NetApp Rackmount
NetApp Installation and SW Subscription Plan
7 X NetApp DSK DRV,320GB,7200 RPM,SATA,B
2 X NetApp DS14MK2AT,AT-FCx CONTROLLER
2 X NetApp CBL,SM,Optical,LC/LC
2 X NetApp SFP,Optical,FC
7 X NetApp Strg,Carr,Subasy-Short,DS14,ATA

2.     The following is **added** to the Master Service Agreement

The initial term of this Amendment to Master Services Agreement ("Amendment Term") shall begin on the Effective Date and shall end Thirty Six (36) months subsequent to the Effective Date. Subsequent to the Initial Term, this Amendment shall automatically renew for additional consecutive one year periods ("Renewal Term(s)") unless one party notifies the other party at least sixty (60) days prior to the expiration of the then-current term of its intention to not renew this Amendment.

3.     In the event of any conflict between the terms of the Master Service Agreement and MSA Enterprise Schedules and this Amendment, the terms of this Amendment shall govern.

4.     This Amendment may be executed in counterparts which, when taken together, shall constitute one and the same agreement and shall be effective as of the Effective Date as defined above. Execution and delivery of this Amendment by exchange of facsimile copies bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Amendment by such party. Such facsimile copies shall constitute enforceable original documents.

5.     Except as otherwise expressly modified by this Amendment, all terms, provisions, covenants and agreements contained in the Master Service Agreement and MSA Enterprise Schedules shall remain unmodified and in full force and effect.

This Amendment is executed as of the Effective Date set forth above.

Sigma Chi                                 Incentra Solutions, Inc.

By: _Daniel Walker_                       By: _Michael H. Parsons_

Name: _Daniel Walker_                     Name: _MICHAEL H. PARSONS_

Title: _DIRECTOR OF IT_                   Title: _VP OF OPERATIONS_

Date: _4 OCT 2006_                        Date: _10/6/06_

# AMENDMENT TO MASTER SERVICE AGREEMENT

This Amendment to Master Service Agreement and Schedules is made as of the ~ 11th day of October, 2006 (the "Effective Date"), by and between Sigma Chi ("Customer") and Incentra Solutions, Inc.

## RECITALS:

A.    The parties entered into a certain Master Service Agreement and MSA Enterprise Schedules ("MSA Agreement") effective as of May 31st, 2006. Capitalized terms used in this Amendment and not defined herein shall have the meanings given in the Master Service Agreement.

B.    The parties now desire to amend the Master Service Agreement and MSA Enterprise Schedules as set forth herein.

## AGREEMENT:

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sigma Chi and Incentra Solutions hereby agree as follows:

1.    The following is **added** to Exhibit A Schedule 3 ("Pricing") of the MSA Enterprise Schedules.

### GridManage Disk NetApp Replication Management

Pricing for GridManage Disk Replication Management of up to 2TB of "Usable" replicated storage shall be included in the IBM Credit ValuePlan Lease contract with the equipment listed below in Table A. All "Usable" replicated storage over 2 TB will be billed directly to Sigma Chi at the rate listed below.

| | |
|---|---|
| Monthly Fee for Replication Management up to 2TB | $3,000/month |
| Additional Disk Replication Management over 2TB | $.88/per GB |

This pricing is based on "Usable" replicated storage. The customer provided equipment in which Incentra Solutions shall manage is listed below in Table A. This equipment will be located in the Incentra Solutions Data Center in Broomfield, Colorado.

### Hosting Services

Pricing for Managed Hosting Services is based on the equipment listed in Table A. Hosting includes Space, Power and 2Mb connection.

| | |
|---|---|
| Managed Hosting | $2,000/month |

TABLE A

| | |
|---|---|
| FAS3020 ISCSI BASE,OS,1G CF,R5 | 1 |
| SnapRestore Software,SAN,T3-C | 1 |
| CIFS Software,T3-C | 1 |
| SnapMirror Software,T3-C | 1 |
| Disk Shelf,4.5TB SATA,R5 | 3 |
| SW Subs,SnapDrive for Windows | 10 |
| SnapDrive,Windows | 10 |
| DSK DRV,320GB,7200 RPM,SATA,B,R5 | 7 |

2.　　The following is **added** to the Master Service Agreement

　　　The initial term of this Amendment to Master Services Agreement ("Amendment Term") shall begin on the Effective Date and shall end Thirty-Six (36) months subsequent to the Effective Date. Subsequent to the Initial Term, this Amendment shall automatically renew for additional consecutive one year periods ("Renewal Term(s)") unless one party notifies the other party at least sixty (60) days prior to the expiration of the then-current term of its intention to not renew this Amendment.

3.　　In the event of any conflict between the terms of the Master Service Agreement and MSA Enterprise Schedules and this Amendment, the terms of this Amendment shall govern.

4.　　This Amendment may be executed in counterparts which, when taken together, shall constitute one and the same agreement and shall be effective as of the Effective Date as defined above. Execution and delivery of this Amendment by exchange of facsimile copies bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Amendment by such party. Such facsimile copies shall constitute enforceable original documents.

5.　　Except as otherwise expressly modified by this Amendment, all terms, provisions, covenants and agreements contained in the Master Service Agreement and MSA Enterprise Schedules shall remain unmodified and in full force and effect.

This Amendment is executed as of the Effective Date set forth above.

Sigma Chi

By: _____

Name: Daniel Walker

Title: Director on IT

Date: Oct 11, 2006

Incentra Solutions, Inc.

By: _____

Name: _____

Title: _____

Date: _____

# EXHIBIT B

# INCENTRA
## S O L U T I O N S
2050-80 Finley Road, Lombard, IL 60148

| | |
|---|---|
| Invoice | INV-000501 |
| Date | 2/28/2007 |
| Page | 1 of 1 |
| Order # | INCO6475 |

### Bill To:

Sigma Chi Foundation
Accounts Payable
1714 Hinman Avenue
Evanston, IL 60201

### Ship To:

Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, IL 60201

| PO Number | Customer No. | Salesperson ID | Shipping Method | Payment Terms | Location |
|---|---|---|---|---|---|
| | | | | Net 30 Days | CHI |
| Signed Proposal | SIGCHE01 | Wosneski, Rob | | | |

| Billed | Item Number | Description | Unit Price | Ext Price |
|---|---|---|---|---|
| 41.75 | IMW-Pro-Serv-SE | Supplemental Support for February 2007 - Steve Black | 150.00 | 6,262.50 |

REMIT TO:    Incentra Solutions, Dept. 1889, Denver, CO  80291-1889

| | |
|---|---|
| Subtotal | $6,262.50 |
| Transaction Fee | 0.00 |
| Freight | 0.00 |
| Sales Tax | 0.00 |
| Total | $6,262.50 |

Incentra Solutions of the Midwest | 630.904.9600 | 2050-80 Finley Road, Lombard, IL  60148

# EXHIBIT C-1



**INCENTRA**
S O L U T I O N S

Incentra Solutions
2050-80 Finley Road
Lombard, IL  60148
Phone: (630) 904-9600
Fax: (630) 904-9601

# Proposal

| Date | Proposal # |
|------|-----------|
| 12/14/06 | INCQ6548 |

**Sold To:** Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, Il 60201

**Ship To:** Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, Il 60201

| | | | | |
|---|---|---|---|---|
| **Phone:** | (847) 869-3655 x258 | | **Phone:** | (847) 869-3655 x258 |
| **Fax:** | (847) 869-4906 | | **Fax:** | (847) 869-4906 |

| Terms | Sales Rep | P.O. Number | Ship Via |
|-------|-----------|-------------|----------|
| Net 30 Days | Rob Wosneski | | STD TWO |

| Line | Qty | Part # | Manufacturer | Description | Unit Price | Ext. Price |
|------|-----|--------|--------------|-------------|------------|------------|
| 1 | | | | **Savid - Red Hat Server Conversion and Two SQL Databases Ported Over** | | |
| 2 | 1 | Incentra PS | Incentra | Installed and configured apache using the proper modules, specifically mssql, mysql. Also install      MySQL 5.0.5. Installed FreeTDS, unixODBC, and the sybase libraries to support the MSSQL connection for horizons. | $18,185.00 | $18,185.00 |
| | | | | SubTotal | | $18,185.00 |
| | | | | *Total | | **$18,185.00** |

*plus applicable tax + shipping costs

Pricing and terms set forth in this proposal are valid for 30 days from the date specified above. Any and all changes that are requested or required will render all pricing and terms of this proposal null and void, pending the submission of a revised proposal. NST will invoice hardware and software separately from Professional Consulting Services. Product will be invoiced upon shipment to NST's facility or client site.  Professional Consulting Services will be invoiced according to the Terms and Conditions of the NST Scope of Work.

Returns accepted in accordance with manufacturer's policies, only within 30 days of invoice, and with all original packaging materials, manuals, and documentation. NST reserves the right to issue RMA's. Items returned without prior RMA will be refused.

Customer Signature: _Daniel Walker_

Date: _15 DEC 2006_

Customer PO: _funds already applied_

 savidtechnologies

# Work Order

**Order Number:**

**Date:**
12/15/2006

## Contact Information

## Location

**Company:**
Incentra

**Site Where Work Performed:**
Savid Office

**Contact:**
Daniel Walker

**Engineer Assigned:**
Michael Davis

**Phone Number:**

**Start Time:**
8PM

**Date Performed:**
12/10/2006

**E-Mail Address:**

**End Time:**
3AM

**Total Hours:**
80

## Problem Description

Sigma-Chi wanted to move www2.sigmachi.org from an old RedHat server to a new RedHat Server. This moved required moving 2 MySQL databases as well.

## Tasks / Services Performed

Installed and configured apache using the proper modules, specifically mssql, mysql. Also install MySQL 5.0.5. Installed FreeTDS, unixODBC, and the sybase libraries to support the MSSQL connection for horizons.

## Customer Approval

Signature _____                    Date 15 DEC 2006

I hereby acknowledge the satisfactory completion of the above work

Savid Technologies provides no other guarantees written or implied other than what is specifically stated in the descriptions above. When contracting with Savid Technologies , the customer agrees to pay the hourly rate specified for the amount of time agreed upon for services rendered. Savid Technologies does not guarantee its work other than agreeing to provide a competent and certified IT professional who specializes in the practice of Information Technology for which stated work is being performed for the time period agreed upon between Savid Technologies and the customer.

Customer is advised that there is a risk that data and other files may be lost in connection with work that Savid Technologies performs for the customer and that a complete backup of all data should be performed before Savid Technologies performs any work. Customer agrees that Savid Technologies shall have no liability or responsibility for any loss of data or other files.

# EXHIBIT C-2



SOLUTIONS
2050-80 Finley Road, Lombard, IL 60148

| | |
|---|---|
| Invoice | INV-000205 |
| Date | 12/29/2006 |
| Page | 1 of 1 |
| Order # | INCO6548 |

| Bill To: |
|---|
| Sigma Chi Foundation<br>Accounts Payable<br>1714 Hinman Avenue<br>Evanston, IL 60201 |

| Ship To: |
|---|
| Sigma Chi International Fraternity<br>Daniel Walker<br>1714 Hinman Avenue<br>Evanston, Il 60201 |

| PO Number | Customer No. | Salesperson ID | Shipping Method | Payment Terms | Location |
|---|---|---|---|---|---|
| Signed Proposal | SIGCHE01 | Wosneski, Rob | | Net 30 Days | CHI |

| Billed | Item Number | Description | Unit Price | Ext Price |
|---|---|---|---|---|
| 1.00 | IMW-Ext-Pro-Serv-SE | Red Hat Server Conversion and Two SQL Databases Ported Over | 18,185.00 | 18,185.00 |

REMIT TO:    Incentra Solutions, Dept. 1889, Denver, CO 80291-1889

| | |
|---|---|
| Subtotal | $18,185.00 |
| Transaction Fee | 0.00 |
| Freight | 0.00 |
| Sales Tax | 0.00 |
| Total | $18,185.00 |

Incentra Solutions of the Midwest | 630.904.9600 | 2050-80 Finley Road, Lombard, IL 60148

# EXHIBIT D-1



Incentra Solutions
2050-80 Finley Road
Lombard, IL 60148
Phone: (630) 904-9600
Fax: (630) 904-9601

# Proposal

| Date | Proposal # |
|------|-----------|
| 12/13/06 | INCQ6475 |

**Sold To:** Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, Il 60201

**Ship To:** Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, Il 60201

**Phone:** (847) 869-3655 x258
**Fax:** (847) 869-4906

**Phone:** (847) 869-3655 x258
**Fax:** (847) 869-4906

| Terms | Sales Rep | P.O. Number | Ship Via |
|-------|-----------|-------------|----------|
| Net 30 Days | Rob Wosneski | | |

| Line | Qty | Part # | Manufacturer | Description | Unit Price | Ext. Price |
|------|-----|--------|--------------|-------------|------------|------------|
| 1 | 1 | Incentra PS | PS | Incentra PS Per Nigels SOW | $47,200.00 | $47,200.00 |
| | | | | | SubTotal | $47,200.00 |
| | | | | | **Total** | **$47,200.00** |

**\* plus applicable tax + shipping costs**

Pricing and terms set forth in this proposal are valid for 30 days from the date specified above. Any and all changes that are requested or required will render all pricing and terms of this proposal null and void, pending the submission of a revised proposal. NST will invoice hardware and software separately from Professional Consulting Services. Product will be invoiced upon shipment to NST's facility or client site. Professional Consulting Services will be invoiced according to the Terms and Conditions of the NST Scope of Work.

Returns accepted in accordance with manufacturer's policies, only within 30 days of invoice, and with all original packaging materials, manuals, and documentation. NST reserves the right to issue RMA's. Items returned without prior RMA will be refused.

Customer Signature: _____

Date: _____

Customer PO: _____

# EXHIBIT D-2

# INCENTRA
## S O L U T I O N S
2050-80 Finley Road, Lombard, IL 60148

| | |
|---|---|
| Invoice | INV-000476 |
| Date | 2/24/2007 |
| Page | 1 of 1 |
| Order # | INCO8513 |

| Bill To: | Ship To: |
|---|---|
| Sigma Chi Foundation<br>Accounts Payable<br>1714 Hinman Avenue<br>Evanston, IL 60201 | Sigma Chi International Fraternity<br>Brad Nihls<br>1714 Hinman Avenue<br>Evanston, IL 60201 |

| PO Number | Customer No. | Salesperson ID | Shipping Method | Payment Terms | Location |
|---|---|---|---|---|---|
| PS Performed | SIGCHE01 | Wosneski, Rob | | Net 30 Days | CHI |

| Billed | Item Number | Description | Unit Price | Ext Price |
|---|---|---|---|---|
| 296.00 | IMW-Exl-Pro-Serv-SE | IMW Professional Services - External PS - TEK Systems Websphere Project | 200.00 | 59,200.00 |

**REMIT TO:** Incentra Solutions, Dept. 1889, Denver, CO 80291-1889

| | |
|---|---|
| Subtotal | $59,200.00 |
| Transaction Fee | 0.00 |
| Freight | 0.00 |
| Sales Tax | 0.00 |
| Total | $59,200.00 |

Incentra Solutions of the Midwest | 630.904.9600 | 2050-80 Finley Road, Lombard, IL 60148

# EXHIBIT E-1



**INCENTRA**
S O L U T I O N S

Incentra Solutions
2050-80 Finley Road
Lombard, IL 60148
Phone: (630) 904-9600
Fax: (630) 904-9601

# Proposal

| Date | Proposal # |
|------|-----------|
| 10/11/06 | NSTQ5503 |

**Sold To:** Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, Il 60201

**Ship To:** Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, Il 60201

**Phone:** (847) 869-3655 x258
**Fax:** (847) 869-4906

**Phone:** (847) 869-3655 x258
**Fax:** (847) 869-4906

| Terms | Sales Rep | P.O. Number | Ship Via |
|-------|-----------|-------------|----------|
| NET 30 | Rob Wosneski | | Ground |

| Line | Qty | Part # | Manufacturer | Description | Unit Price | Ext. Price |
|------|-----|--------|--------------|-------------|------------|------------|
| 1 | 1 | AR2105BLK | APC | NETSHELTER VX 25U ENCLOSURE BLACK W/SIDES | $989.00 | $989.00 |
| | | | | SubTotal | | $989.00 |
| | | | | *Total | | $989.00 |

*** plus applicable tax + shipping costs**

Pricing and terms set forth in this proposal are valid for 30 days from the date specified above. Any and all changes that are requested or required will render all pricing and terms of this proposal null and void, pending the submission of a revised proposal. NST will invoice hardware and software separately from Professional Consulting Services. Product will be invoiced upon shipment to NST's facility or client site. Professional Consulting Services will be invoiced according to the Terms and Conditions of the NST Scope of Work.

Returns accepted in accordance with manufacturer's policies, only within 30 days of invoice, and with all original packaging materials, manuals, and documentation. NST reserves the right to issue RMA's. Items returned without prior RMA will be refused.

Customer Signature: _Dan Walker_    Date: _10/11/06_

Customer PO: _Per Net App Deal_

_RnA full flight cabinet    (NSTO5302)_

# EXHIBIT E-2

# INCENTRA
## SOLUTIONS
2050-80 Finley Road, Lombard, IL 60148

| | |
|---|---|
| Invoice | INV-000240 |
| Date | 12/15/2006 |
| Page | 1 of 1 |
| Order # | NSTO5503 |

**Bill To:**

Sigma Chi Foundation
Accounts Payable
1714 Hinman Avenue
Evanston, IL 60201

**Ship To:**

Sigma Chi International Fraternity
Daniel Walker
1714 Hinman Avenue
Evanston, IL 60201

| PO Number | Customer No. | Salesperson ID | Shipping Method | Payment Terms | Location |
|---|---|---|---|---|---|
| Signed Proposal | SIGCHE01 | Wosneski, Rob | GROUND | Net 30 Days | CHI |

| Billed | Item Number | Description | Unit Price | Ext Price |
|---|---|---|---|---|
| 1 | AR2105BLK | NETSHELTER VX 25U ENCLOSURE BLACK W/SIDES | 989.00 | 989.00 |

**REMIT TO:** Incentra Solutions, Dept. 1889, Denver, CO 80291-1889

| | |
|---|---|
| Subtotal | $989.00 |
| Transaction Fee | 0.00 |
| Freight | 15.67 |
| Sales Tax | 66.76 |
| Total | $1,071.43 |